# IN THE UNITED STATES DISTRICT COURT
# OF THE DISTRICT OF NEW MEXICO

CHARL Y. HOLMES, Individually and as Personal Representative of the Estate of Kevin W. Holmes, and as Parent Guardian, and Next Friend of KELSEY ELIZABETH HOLMES and CONNER HOLMES, Statutory Wrongful Death Beneficiaries of KEVIN W. HOLMES, Decedent,

    Plaintiffs,

vs.                                                        No. CIV-00-1707 (ACE)
                                                             Judge: Leslie C. Smith

SHANE EIDSON, an Individual and WIN, PLACE, & SHOW, INCORPORATED, a New Mexico Corporation,

    Defendants.

## DEFENDANT WIN, PLACE & SHOW, INCORPORATED'S
## PRELIMINARY REQUESTED FINDINGS OF FACT AND CONCLUSIONS OF LAW

COMES NOW Defendant Win, Place & Show, Incorporated ("WPS"), and submits the following preliminary requested Findings of Fact and Conclusions of Law.

## REQUESTED FINDINGS OF FACT

1. Charl Holmes has been appointed by the appropriate New Mexico state court to serve as the Personal Representative of the Estate of Kevin Holmes and the statutory wrongful death beneficiaries for the purposes of pursuing this lawsuit in accordance with the New Mexico Wrongful Death Act, NMSA 1978, §41-2-1 et seq. (1996).

2. Kelsey Elizabeth Holmes and Conner Holmes are the two children from the marriage of Charl Holmes and Kevin Holmes.

3. WPS is a small lounge located in Ruidoso, New Mexico, and has done business from the same location since the 1950s. It is owned by the Win, Place & Show, Incorporated, a New Mexico corporation, which is a small, closely held family corporation, the principals of which are Eddie Fowler, and his son Dean Fowler.

4. WPS at all times relevant to this case, and at the present time, is primarily managed by Dean Fowler.

5. WPS enjoys a good reputation in the community and with law enforcement authorities in Ruidoso. It has not had a significant number of problems requiring law enforcement involvement.

6. WPS serves a generally older crowd, and it is rare that any sort of physical altercation takes place there.

7. All the employees of WPS undertake alcohol server training, as required by the statutes of State of New Mexico, and included is training regarding how to spot and deal with signs of intoxication.

8. In addition to alcohol server training, WPS engages in ongoing on-the-job type training, which consists of periodic employee meetings occurring at least once a month, and usually more often.

9. At the on-the-job training conducted by WPS , issues such as how to discern whether a person is intoxicated, how to deal with an intoxicated person, how to deal with unruly patrons, how to respond to instances of aggressive behavior, when to decide to cut a patron off from further serving him, and when to call the police is discussed.

10. WPS runs on the premise that security is everyone's business, and on busier evenings, generally employs a doorman whose primary purpose is to check identification and make sure the establishment does not get overcrowded. In addition, the doorman has certain responsibilities with respect to security and monitoring for unruly or aggressive customers.

11. The head bartender also has specific responsibilities with respect to monitoring for security.

12. The policy of WPS is that if an incident occurs involving unruly, belligerent or aggressive behavior, it is immediately broken up, one of the parties to the incident is requested to leave immediately, and then after a reasonable interval, the other party to the incident is requested to leave.

13. Generally speaking, police are not called to WPS unless it is felt that the personnel at the lounge cannot handle the matter themselves.

14. On the evening of January 8-9, 2000, WPS was adequately staffed, and had a reasonable crowd, but was not overcrowded.

15. Mike Friberg was on duty functioning as head bartender. Tommy West was on duty functioning as doorman.

16. Around 8:30-9:00 p.m., a large group of individuals, including Kevin Holmes, Steve Raney, and Scott Teffeteller (hereinafter collectively referred to as the "Holmes group"), came into WPS.

17. The Holmes group all behaved appropriately and evidenced no signs of intoxication at any material point in time.

18. Sometime around 11:00 p.m., the Holmes group plus one other gentleman left WPS and went to another establishment. They came back to WPS at about 1:00 a.m on January 9, 2000.

19. After the Holmes group arrived back at WPS at about 1:00 a.m. on January 9, 2000, Scott Teffeteller sat down at the front bar adjacent to a gentleman named Shane Eidson.

20. Shane Eidson had arrived at WPS at about midnight on the night in question.

21. At all material times, Shane Eidson never evidenced any signs of intoxication.

22. Scott Teffeteller sat in a chair that had been occupied previously by a woman name Jessica Nosker, an acquaintance of Shane Eidson's, who was on the dance floor at the time.

23. Scott Teffeteller and Shane Eidson struck up a conversation, and after a period of time, Jessica Nosker came to retrieve her seat.

24. At the time Jessica Nosker came to retrieve her seat, there was a vocal dispute between Jessica Nosker and Scott Teffeteller, during which Shane Eidson requested that Scott Teffeteller move from Jessica Nosker's seat.

25. Shane Eidson ultimately pushed Scott Teffeteller from Jessica Nosker's seat, and Mr. Teffeteller stumbled away from the seat and grabbed a beer bottle in an aggressive fashion.

26. WPS employees, upon becoming aware of an impending possible altercation, immediately intervened to calm things down, which they were successful in doing.

27. The Holmes group was requested to leave the premises, which they did.

28. After the Holmes group left the premises, Shane Eidson resumed his seat at the bar and remained there without incident.

29. Approximately one-half hour to forty-five minutes after the Holmes group left, Mr. Holmes entered the lounge and requested to use the bathroom and walked to the bathroom, which is in the back of the bar, and passed Shane Eidson without any incident on anybody's part, as the doorman was monitoring the situation.

30. At about this time, the bar was closing. The band that had been playing was packing up, lights were turned on, the bar was being cleaned up, and customers were being requested to leave the premises and were heading towards the door.

31. Kevin Holmes, after leaving the bathroom, was walking again towards the front of the bar where the exit door is located and passed directly by Shane Eidson. He tapped Shane Eidson on the shoulder and said something, either "I'd like to talk to you outside" or "You and me outside, big boy."

32. Mike Friberg witnessed the incident in paragraph 31, and had been discussing meeting Mr. Eidson for breakfast after WPS closed, and told Mr. Eidson not to do anything in response to Kevin Holmes' request.

33. Shane Eidson assured Mike Friberg that they were still going to go to breakfast and that he was just going to go outside and talk to Kevin Holmes.

34. Upon leaving WPS , Shane Eidson was confronted in an aggressive manner by Scott Teffeteller and Kevin Holmes, where upon Shane Eidson pushed Scott Teffeteller first, and then Kevin Holmes with an open hand, to move them away from him.

35. Mr. Holmes stumbled backward and fell, hitting his head on the bumper of a sport utility vehicle.

36. The injury to Kevin Holmes' head ultimately lead to his death.

37. There is no evidence to support that WPS continued to serve visibly intoxicated individuals liquor in violation of the New Mexico Liquor Liability Statutes, NMSA 1978, §60-7A-16 (1993).

38. There is no evidence to support that WPS failed to provide reasonable security measures.

39. The evidence supports that the unfortunate incident and injuries to Kevin Holmes were caused in part by the acts or omissions of Scott Teffeteller, Steve Raney, Shane Eidson, Kevin Holmes, and/or Jessica Nosker, but were not caused by WPS.

40. The blood alcohol concentration of Kevin Holmes at the time of his death was .17%, which is over the legal intoxication level established by NMSA 1978, §66-8-102 (1999), for a determination of driving under the influence.

**REQUESTED CONCLUSIONS OF LAW**

1. This Court has jurisdiction over the parties hereto and the subject matter hereof.

2. It was Kevin Holmes who was the aggressor, since he is the one who invited Shane Eidson to follow him outside, and then approached him in an aggressive manner.

3. Shane Eidson was acting in self-defense at the time he pushed Kevin Holmes away from him.

4. It was not foreseeable that Kevin Holmes would fall and hit his head on a sport utility vehicle at the time Shane Eidson pushed him in self-defense.

5. WPS fulfilled whatever duty it had to Kevin Holmes to provide for his safety and security.

6. WPS did not have a duty to provide for the safety of Kevin Holmes outside of its premises, as far as protecting him from an assault and battery from another individual.

7. There is no evidence to support any liability on the part of WPS under the liquor liability laws of New Mexico.

8. There is insufficient evidence to support that WPS acted in a grossly negligent fashion, such as to allow the imposition of liability under New Mexico's Alcohol Licensee Act, NMSA 1978, §41-11-1 (1986).

9. Since Kevin Holmes' autopsy report indicates that he had a blood alcohol concentration of .170%, he is not entitled to recover against WPS under New Mexico's Alcohol Licensee Act, unless there is evidence that WPS acted in a grossly negligent manner in serving alcoholic beverages to him.

10. WPS acted in a reasonable, non-negligent fashion under the circumstances.

11. There is insufficient evidence to justify the imposition of any punitive damages against WPS .

        HINKLE, HENSLEY, SHANOR & MARTIN, L.L.P.

By: _____
    Richard E. Olson
    Rebecca Nichols Johnson
    Post Office Box 10
    Roswell, New Mexico 88202-0010
    Tel:   505-622-6510
    Fax:  505-623-9332

*Attorneys for Defendant*

# CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing *Defendant Win, Place & Show, Incorporated's Preliminary Requested Findings of Fact and Conclusions of Law* was mailed via U. S. first class mail with sufficient postage prepaid, and if so indicated, via e-mail, to the following on January 7, 2002:

**Via E-Mail: RBrandys@PSBK.com**
Roy R. Brandys
Peticolas, Shapleigh, Brandys, & Kern, P.L.L.C.
701 North St. Vrain
El Paso, Texas 79902
Tel:    915-542-1983
Fax:    915-534-7207
*Attorneys for Plaintiffs Charl Y. Holmes,*
*Kelsey Elizabeth Holmes and Conner Holmes*

**Via E-Mail: jyoungers@zianet.com**
Joleen K. Youngers
Almanzar & Youngers, P.A.
Post Office Box 7256
Las Cruces, New Mexico 88006
Tel:    505-541-8000
Fax:    505-541-9000
*Attorneys for Plaintiffs Charl Y. Holmes,*
*Kelsey Elizabeth Holmes and Conner Holmes*

Rebecca Nichols Johnson