IN THE UNITED STATES DISTRICT COURT

OF THE DISTRICT OF NEW MEXICO

**CHARL Y. HOLMES, Individually
And as Personal Representative of the
Estate of KEVIN W. HOLMES, and
as Parent, Guardian, and Next Friend of
KELSEY ELIZABETH HOLMES and
CONNOR HOLMES, Statutory
Wrongful Death Beneficiaries of
KEVIN W. HOLMES, DECEDENT,**

       Plaintiff,

vs.

**WIN, PLACE & SHOW,
INCORPORATED,
a New Mexico Corporation,**

       Defendant.                            No. CIV 00-1707 LCS/KBM-ACE

**PLAINTIFF'S REQUESTED FINDINGS OF FACT
<u>AND CONCLUSIONS OF LAW</u>**

       Plaintiff Charl Holmes, by and through undersigned counsel, hereby submits the following

Findings of Fact and Conclusions of Law:

**FINDINGS OF FACT**

    1.     Plaintiff Charl Holmes is a resident of El Paso, Texas.

    2.     Charl Holmes is the widow of Kevin Holmes.   Kelsey Elizabeth Holmes and Connor

          Holmes are the children of the marriage of Charl and Kevin Holmes.

    3.     Charl Holmes has been duly appointed Personal Representative of the Estate of Kevin

          Holmes pursuant to the New Mexico Wrongful Death Act.

    4.     Kevin Holmes passed away on January 9, 2000.

5.    Holmes was the Marketing Director of Lawyers Title Company in El Paso, Texas where he had worked since November 22, 1993.

6.    Holmes' compensation consisted of a base salary plus commissions and he was entitled to full fringe benefits in the form of health insurance, life insurance, and retirement benefits.

7.    The incidents giving rise to this lawsuit occurred during the evening of Saturday January 8 and early morning of Sunday January 9, 2000 at the Win, Place, and Show bar in Ruidoso, New Mexico.

8.    The Win, Place, and Show bar is an establishment owned and operated by Win, Place, & Show, Incorporated ("WPS"), a New Mexico corporation, principally engaged in the business of serving and selling alcoholic beverages to the public and licensed by the appropriate New Mexico authorities to do so.

9.    WPS' owners are Thomas Fowler and his son Dean Fowler.

10.    In its sole location at 2516 Sudderth in Ruidoso, New Mexico, WPS operates an establishment with two bars and a package goods store.

11.    For purposes of serving and accommodating its patrons, WPS maintains multiple tables and chairs, along with stools in the two bar areas.

12.    WPS also has a dance floor in the rear of the establishment where live music is played largely on the weekends.

13.    On the evening in question, the WPS had a legal occupant capacity of 195.

14.    It was a Saturday evening and the bar had a live band.

15.    The gross revenue earned by the bar that evening was $2571.30.

16.    The following eight  (8) WPS employees worked that evening in the position and times identified:

    a.      Mike Friberg        front bartender/acting manager (6 p.m. to 2 a.m.)

    b.      Kathy Passig        cocktail waitress (7 p.m. to 2 a.m.)

    c.      Thomas West        doorman (8 p.m. to 2 a.m.)

    d.      Rita Robinson        back bartender (8 p.m. to 2 a.m.)

    e.      Amy Oppegard        bartender (8 p.m. to 2 a.m.)

    f.      Michelle Kannady        cocktail waitress (8:30 p.m. to 2 a.m.)

    g.      Lisa Providence        cocktail waitress (8:30 p.m. to 2 a.m.)

    h.      Dean Fowler        owner (7  a.m. to 9 p.m.)

23.    During the two year period  prior to the incident in question, there were 47 instances in which the police were called to the WPS in response to a disturbance of some sort occurring there. Of these calls, 11 involved alleged physical assaults, batteries,  or altercations.

24.    On the weekend of January 8, 2000, Kevin Holmes ("Holmes"), was in Ruidoso attending a retreat sponsored by an El Paso civic organization known as the Sunturians, together with approximately thirty other members and some of their spouses and families.

25.    On January 8, 2000, between 8:00 and 9:00 p.m., Holmes and some of his fellow Sunturians went to WPS.

26.    While at WPS, Holmes and the others sat at a group of tables in the front section of the bar where they were waited on by Michelle Kannady, a cocktail waitress.

27.    Holmes and his friends remained at WPS where they socialized and drank beer for

approximately two hours.

28.    After paying their bill, Amy Oppegard, a bartender at the front bar, advised Mike Friberg, another bartender and acting manager, that Holmes and his friends, including but not limited to Scott Teffeteller, were "cut off," meaning they were prohibited from being sold any alcoholic beverages for the rest of the evening.

29.    The policy in effect at WPS at that time regarding customers who had been "cut off" required the employees of WPS to advise each other of the individual(s) who had been "cut off" so that they would not be served any more alcoholic beverages.

30.    When Holmes left WPS the first time that evening, he was accompanied Scott Teffeteller, Steve Raney, and Jason Chapman.

31.    They walked across the street to a bar known as the "Quarters".

32.    Quarters is another establishment owned by the Fowlers where alcohol is sold.

33.    Holmes remained at Quarters for approximately two hours where he and the others played pool and darts and drank beer. Their time passed there without incident.

34.    In the meantime, Shane Eidson, a Ruidoso resident, arrived at the WPS.

35.    Eidson had drank beer prior to arriving at WPS where he drank a few beers.

36.    Eidson went to WPS to meet Jennifer Nosker, a friend of his, at WPS.

37.    When Eidson arrived at WPS, he met Nosker and her friend Ryan Ainsworth and took a stool at the front bar.

38.    Eidson's old friend and high school football teammate, Mike Friberg, was tending bar and serving as the acting manager.

39.    While at WPS that evening, Eidson was served multiple "Crown and Sevens" (bourbon

and Seven-Up) and drank at least one "kamikaze" shot.

40. At the time, Eidson was 27 years old, 6'2" tall, and weighed approximately 250 pounds.

41. Eidson, a former collegiate football player and weightlifter, had a muscular build physical condition

42. Upon leaving Quarters, Holmes, Teffeteller, Raney, and Chapman decided to return to WPS for last call.

43. Even though WPS had cut them off, Thomas West, the doorman, allowed them to return to the bar.

44. Teffeteller went to the back bar and ordered a round of kamikaze shots and beers for the four of them.

45. Rita Robinson, the back bartender served the drinks to Teffeteller.

46. Teffeteller and Holmes were obviously intoxicated and WPS served alcoholic beverages to them anyway.

47. When he received the drinks, Teffeteller observed an open stool next to Eidson and sat down.

48. Teffeteller could not locate Holmes or Chapman, so he offered one of the drinks to Eidson and the person sitting next to him and they accepted.

49. Teffeteller and Eidson made small talk during which time Eidson never advised Teffeteller he was supposedly sitting in Nosker's stool.

50. During this time, Eidson's friend, Nosker, had been dancing with her friend, Ainsworth.

51. Nosker returned to the bar where Eidson and Teffeteller were sitting and confronted Teffeteller, ordering him out of what she claimed to be her stool.

52.     Nosker's language toward Teffeteller was vulgar and  confrontational.

53.     Teffeteller declined to relinquish the stool and turned away from her and Eidson.

54.     Shortly thereafter, without warning or provocation, Eidson struck Teffeteller causing him to leave his stool, travel over at least one other stool,  and fall toward the ground.

55.     As he was falling toward the ground, in response to the unexpected attack of Eidson, Teffeteller grabbed a beer bottle from the bar.

56.     With the assistance of Raney, Teffeteller regained his balance and maintained his composure.

57.     Teffeteller did not retaliate against Eidson.

58.     Friberg, West,  Passig, and Oppegard either observed Eidson strike Teffeteller or were made aware of it immediately thereafter.

59.     WPS maintained a policy at that time that if patrons engaged in a physical confrontation, they were required to leave, one first and then the other.

60.     WPS failed to follow its policy following the physical attack of Eidson on Teffeteller.

61.     Eidson was not required to leave the establishment.

62.     Eidson should have been required to leave the establishment in accordance with WPS policy and procedures.

63.     WPS did not maintain any written policies or procedures providing any instructions or guidelines to its employees regarding measures to be followed in the event of  a threatened or actual physical altercation or assault and battery.

64.     WPS relied upon monthly staff meetings to disseminate information to its employees regarding policies and procedures  to follow in the event of a threatened or actual physical

altercation.

65.     WPS communicated a policy to its employees directing them not to intervene in a problem involving patrons outside of its building.

66.     The measures undertaken by WPS to implement, maintain, and enforce its policies and procedures regarding the proper handling of situations involving actual or threatened physical altercations at its establishment were inadequate.

67.     Immediately following Eidson's attack on Teffeteller, Eidson stood by his stool and proclaimed in a loud and obnoxious manner that he was "the baddest mother fucker in the bar."

68.     This comment was heard by at least one WPS employee, Kathy Passig.

69.     In response, Passig said, "Sit down Shane, you're drunk."

70.     Eidson was not required to leave the bar.

71.     At the time of Eidson's attack on Teffeteller, Eidson was obviously intoxicated.

72.     Notwithstanding his condition, WPS continued to serve Eidson alcoholic beverages.

73.     In the meantime, Teffeteller, Raney, and Holmes decided to leave the bar and return to their hotel.

74.     They noticed Chapman was not with them and decided to return to the bar to ensure Chapman was not inside or to let him know they were leaving.

75.     Teffeteller and Raney returned to the bar and walked through to the restroom in the rear of the establishment.

76.     Holmes also returned to the bar.

77.     West and Friberg were aware that Teffeteller, Raney, and Holmes returned to the bar.

78.    West and Friberg did not take any action to prevent Teffeteller , Raney, and Holmes from returning to the bar.

79.    West and Friberg were also aware Eidson was still sitting at the front bar where the original altercation with Teffeteller had taken place.

80.    In fact, Friberg had earlier confirmed he would meet Eidson for breakfast after WPS closed.

81.    As Teffeteller and Raney exited the WPS, Holmes approached Eidson while seated on his stool and tapped his shoulder and said something to him.

82.    Friberg was aware that Holmes said something to Eidson and advised Eidson to stay seated.

83.    Friberg was aware that a physical altercation may take place.

84.    West also observed Holmes tap Eidson on the shoulder and say something to him.

85.    West was also aware that a physical altercation might take place.

86.    It was also clear to several patrons in the bar who had observed the interaction involving Eidson, Teffeteller, and Holmes, that a physical altercation was imminent.

87.    Shortly after Holmes tapped Eidson on the shoulder, Eidson got up from his stool and followed Holmes out the front door of the WPS.

88.    Friberg and West saw Eidson follow Holmes out the front door.

89.    At that point, it was obvious to those in the bar including the WPS employees that a fight was about to begin.

90.    The WPS employees did do anything to prevent the fight from occurring.

91.    The WPS employees did not call the police nor direct anyone else to call the police.

92.     There was a telephone at the front bar available for such use.

93.     Friberg and West had sufficient time to call the police but did not do so.

94.     Friberg and West followed Eidson and Holmes out the front door.

95.     While in front of the WPS and while still on WPS property, Eidson physically struck Teffeteller again, this time in the face causing him to lose his glasses and fall to the ground.

96.     Again, the physical attack on Teffeteller was unprovoked.

97.     Immediately after striking Teffeteller, Eidson turned to Holmes and struck him with sufficient force to cause Holmes to fall backward, fall to the ground, and strike the back of his head on the front bumper of a vehicle parked on the street in front of the WPS.

98.     At the time of the incident, there was a Ruidoso Police car patrolling the 2300 to 2600 blocks of Sudderth, an area which included WPS and the blocks immediately surrounding.

99.     If WPS had called the police, they could have been to there within a matter of seconds.

100.    If Eidson would have heard the siren of a police car or seen the lights of such a police vehicle, he would not have struck either Teffeteller or Holmes.

101.    At the time  Eidson struck Holmes,  the patrolling police officer was at the "Quarters", less than one block from the WPS.

102.    After Eidson struck Holmes, representatives of WPS urged Eidson to flee the scene.

103.    Eidson immediately left the scene, walking briskly, then running up the street and around the corner.

104.    The police arrived at the scene within a minute of the incident.

105.    Holmes remained conscious while lying on the street.

106.    Holmes experienced severe pain while lying on the ground and knew that he was seriously

injured and was concerned about dying.

107.   At that point, Holmes experienced severe emotional distress and mental anguish.

108.   Holmes was transported to the local hospital in Ruidoso where emergency medical measures were undertaken to save his life to no avail.

109.   Holmes fought for his life and suffered severe physical pain upon striking his head on the bumper of the vehicle.

110.   Kevin Holmes died from a severe blunt trauma to his head.

## CONCLUSIONS OF LAW

1.   WPS owed a duty to its patrons, including Holmes, to use ordinary care to keep its premises safe for their use.

2.   The duty of reasonable care that WPS owed to its patrons encompassed a duty to protect patrons against conditions that foreseeably pose an unreasonable risk of injury.

3.   The duty of reasonable care that WPS owed to its patrons encompassed a duty to protect patrons from the harmful acts of third persons that WPS employees, by the exercise of reasonable care. could have discovered were being done or were about to be done, and could have protected against the injury by controlling the conduct of the other patron. *Reichert v. Atler, d/b/a the A-Mi-Gusto Lounge*, 117 N.M. 623, 624, 875 P.2d 379, 380 (1994) (quoting *Coca v. Arceo*, 71 N.M 186, 189, 376 P.2d 970, 973 (1962).

4.   The duty of reasonable care that WPS owed to its patrons encompassed a duty to protect patrons  from the foreseeable conduct of a third party, whether that conduct is innocent, negligent, intentionally tortious, or criminal.  *Reichert v. Atler, d/b/a the A-*

*Mi-Gusto Lounge*, 117 N.M. 623, 624, 875 P.2d 379, 380 (1994);  UJI 13-1309

NMRA 1996.

5.      The duties WPS owes to its patrons are not limited to physical boundaries of the building or property.  *Bober v. New Mexico State Fair*, 111 N.M. 644, 648-49, 808 P.2d 614, 618-19 (1991); *Mitchell v. C & H Transp. Co.*, 90 N.M. 471, 475, 565 P.2d 342, 346 (1977).

6.      The duties WPS owes to its patrons extends outside of the building, includes the premises surrounding the building, the parking area,  and the area of ingress and egress. *Monett v. Dona Ana County Sheriff's Posse, et al.,*  114 N.M. 452, 840 P.2d 599 (Ct. App. 1992); *Mitchell v. C & H Transp. Co.*, 90 N.M. 471, 475, 565 P.2d 342, 346 (1977).

7.      The duty of WPS extended to the place where the incident occurred which gave rise to this suit.

8.      It was foreseeable that Shane Eidson would strike Kevin Holmes.

9.      The injuries and death of Kevin Holmes resulted from being struck by Shane Eidson.

10.     WPS breached its duty of reasonable care under the circumstances owed to Kevin Holmes.

11.     WPS breached its duty to Kevin Holmes when it failed to control Eidson.

12.     WPS breached its duty to Kevin Holmes when if failed to call the police.

13.     WPS breached its duty to Kevin Holmes when it failed to protect him from Eidson.

14.     WPS breached its duty to Kevin Holmes when it failed to prevent the altercation from occurring.

15.     WPS breached its duty to provide adequate security for its patrons, including Kevin Holmes.

16.     The acts and omissions of WPS were the proximate cause of the injuries and death of Kevin Holmes and the damages sustained by his survivors.

17.     The acts and omissions of WPS were the direct cause of the injuries and death of Kevin Holmes and the damages sustained by his survivors.

18.     The employees of WPS acted with gross disregard for the safety of Kevin Holmes, justifying an award of punitive damages.

19.     WPS and its employees were licensees as defined by New Mexico Liquor Control Act, Section 41-11-1(D)(1), NMSA 1978.

20.     WPS employees served alcohol to Shane Eidson while he was intoxicated.

21.     WPS employees knew or should have know from the circumstances and what was reasonably apparent to them that Shane Eidson was intoxicated when they continued to serve him alcohol.

22.     WPS employees acted with gross negligence or reckless disregard for the safety of its patrons when they continued to serve Shane Eidson with alcohol.

23.     WPS employees served alcohol to Kevin Holmes and his friends while they were intoxicated.

24.     WPS employees knew or should have known from the circumstances and what was reasonably apparent to them that Kevin Holmes and his friends were intoxicated when they continued to serve them alcohol.

25.     WPS employees acted with gross negligence or reckless disregard for the safety of

Kevin Holmes and his friends when they continued to serve them alcohol.

26.     If the Court determines that more than one party has liability for the death of Kevin Holmes, then the liability must be allocated among those parties against whom liability lies.

27.     As a result of the incident in question, damages should be awarded in the following categories:

a.      The reasonable expenses of Kevin Holmes' necessary medical care and treatment;

b.      The reasonable expenses of Kevin Holmes' funeral and burial;

c.      The pain and suffering experienced by Kevin Holmes between the time of injury and death;

d.      The lost earnings, the lost earning capacity and the value of the lost household services of the Kevin Holmes, considering his age, earning capacity, health, habits, and life expectancy;

e.      The value of Kevin Holmes' life apart from his earning capacity;

f.      The emotional distress to Charl Y. Holmes caused by the loss of society, guidance, companionship and sexual relations enjoyed with Kevin Holmes;

g.      The loss of guidance and counseling to Kevin Holmes' minor children.

Respectfully submitted,

**ALMANZAR & YOUNGERS, P.A.**

---

Joleen K. Youngers
P.O. Box 7256
Las Cruces, NM 88006
(505) 541-8000
(505) 541-9000 (Fax)

-AND-

Roy Brandys
**PETICOLAS, SHAPLEIGH,**
**BRANDYS & KERN, P.LL.C.**
701 N. St. Vrain St.
El Paso, TX 79902
915/ 542-1983
915/ 534-7207 (Fax)

*Attorneys for Plaintiff*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a copy of the foregoing was sent via email and regular mail to Richard E. Olson and Rebecca Johnson, HINKLE, HENSLEY, SHANOR & MARTIN, L.L.P., P.O. Box 10, Roswell, NM 88202-0010 on this _____ day of January, 2002.

---

JOLEEN K. YOUNGERS